UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-81385-CIV-MARRA

LIFESTYLE VACATION INCENTIVES, LLC,
a Florida limited liability company,
and THOMAS COOK USA HOLDINGS, INC.,
a Florida corporation,

      Plaintiffs,

v.

KEN STERNFELD, an individual,
ATRIUM ENTERPRISES, LTD, an unknown
Business entity, DALE FOWLER, and individual,
and DOES 1-3, unknown individuals or entities,

      Defendants.
_____/

## OPINION AND ORDER

THIS CAUSE is before the Court upon Plaintiffs/Counter-Defendants Motion to Dismiss Defendants/Counter-Plaintiffs, Ken Sternfeld and Atrium Enterprises, Ltd.'s, Amended Counterclaim (DE 36).[1] Counter-Plaintiff Atrium Enterprises, Ltd, filed its Response (DE 40). No Reply was filed. The Court has carefully considered the briefs of the parties and is otherwise fully advised in the premises.

### I. Introduction[2]

      Counter-Defendants, Lifestyle Vacation Incentives, LLC ("LVI"), and Thomas Cook USA Holdings, Inc., are in the business of providing travel benefits, such as discount airline tickets, coupon booklets, vacation packages and other related products. In conducting their business,

---

[1] For purposes of clarity, the Court will refer to Defendant/Counter-Plaintiff Atrium Enterprises, Ltd, only as either Counter-Plaintiff or Atrium. Likewise, the Court will refer to Plaintiffs/Counter-Defendants Lifestyle Vacation Incentives, LLC, and Thomas Cook USA Holdings, Inc., only as Counter-Defendants. Defendant/Counter-Plaintiff Ken Sternfeld has voluntarily dismissed all individual claims alleged in the Counterclaim. (DE 38); *see also infra* note 4.

[2] The Court accepts all of Counter-Plaintiff's allegations as true in determining whether Counter-Plaintiff has stated a claim for which relief can be granted. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Counter-Defendants enter into agreements with brokers to facilitate the marketing, advertising, and promotion of their products. One of the Counter-Plaintiffs, Ken Sternfeld, was employed with Counter-Defendants as one of these brokers. (DE 30 ¶ 6). During the course of his work, Sternfeld began to provide his services through a business entity called Atrium Enterprises, Ltd. Atrium has brought the Counterclaim at issue here.

Counter-Defendants entered into a customer services agreement with Atrium.[3] At some point in time, Atrium began establishing business relationships with various organizations. For example, Atrium "secured an order for the purchase of travel certificates" to be distributed to the patrons of Foxwoods Resort Casinos. (DE 30 at 4 ¶ 9). Atrium also attempted to "secure a contract to provide travel certificates" to the patrons of Caesars Entertainment Corporation—an establishment with "more than thirty (30) casino locations nationwide and 49 million rewards members." (DE 30 at 5 ¶ 17). Specifically, it is alleged as to Atrium's prospective relationship with Foxwoods, the certificates provided to Foxwoods' patrons required them to contact a call center of Counter-Defendants, "which then redeemed or 'fulfilled' the certificates utilizing a unique PIN appearing on the face of each certificate." (DE 30 at 4 ¶ 10). And as to Atrium's prospective relationship with Caesars, Counter-Defendants were to provide "a 'pilot' call center test . . . to examine the customer service and redemption validity of the certificates." (DE 30 at 5 ¶ 18).

However, according to the terms of the customer services agreement, the services that

---

[3] The Court notes that this Customer Services Agreement (DE 1-7), while attached to Counter-Defendants' initial Complaint (DE 1), is not attached to Atrium's Counterclaim (DE 30). Nevertheless, the Court considers the document for three reasons: 1) Atrium's Answer admits that Atrium entered into a customer services agreement with Counter-Defendants (DE 30 at 2 ¶ 9) and Atrium's Counterclaim specifically alleges a relationship with and obligations of Counter-Defendant LVI relative to Atrium's customers. (DE 30 at 4 ¶ 10; 5 ¶ 18); 2) Atrium's Response acknowledges "[i]t is undisputed that ATRIUM had a relationship with [Counter-Defendants] through their Customer Services Agreement [DE-1-7]" (DE 40 at 3); and 3) consistent with Eleventh Circuit precedent, "a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." *Maxcess, Inc. v. Lucent Tech., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005). This Agreement is central to Atrium's claim since it establishes the legal relationship between the parties and impacts the analysis of the elements of the claims asserted by Atrium. Moreover, neither party disputes the Agreement's authenticity.

2

Counter-Defendants were to provide are to be specified in confirmations which, "when approved by [Counter-Defendants] and [Atrium] through a valid purchase order, shall become part of [the] Agreement." (DE 1-7 at 1: I. SERVICES TO BE PROVIDED BY SELLER).  The agreement further provides that "[a]ll confirmations and [purchase orders] shall be governed only by the terms and conditions of this Agreement notwithstanding any apparent terms and conditions on such confirmations or [purchase orders]." (DE 1-7 at 3: VI. MISCELLANEOUS: C. Entire Agreement). Thus, based on the terms of the agreement, fulfillment of the sales Atrium obtained from Foxwoods and Caesars was contingent on the joint approval of Counter-Defendants and Atrium.

Atrium brings two counts of tortious interference with a business relationship against Counter-Defendants alleging that they "intentionally and unjustifiably" refused to redeem, honor, or fulfill the certificates that Atrium distributed to Foxwoods and Caesars.[4] (DE 30 at 5 ¶¶ 11–15, at 6 ¶¶ 19–22).  Counter-Defendants have moved to dismiss the claim on the grounds that they, "as parties to the alleged transactions, could not be considered a stranger to a business relationship, and, therefore, cannot be liable for tortious interference as to all Counts." (DE 36 at 4). The Court agrees with Counter-Defendants. For the reasons that follow, Counter-Defendants' Motion to Dismiss Atrium's Counterclaim (DE 36) is granted.

## II. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

---

[4] Initially, Counter-Plaintiffs—Atrium and Ken Sternfeld—alleged three counts of tortious interference with a business relationship, arguing that Counter-Defendants "intentionally and unjustifiably interfered" with three of Counter-Plaintiffs' distinct business relationships, causing harm. (DE 30 at 4–6). Following the filing of Counter-Defendants' Motion to Dismiss (DE 36), however, Counter-Plaintiffs voluntarily dismissed without prejudice all individual claims alleged in Counts I, II, and III of the Counterclaim as to Counter-Plaintiff Ken Sternfeld, and Count III of the Counterclaim as to Counter-Plaintiff Atrium Enterprises, Ltd. (DE 38). Thus, the only remaining counts of the Counterclaim are Counts I and II brought by Atrium.

obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

### III. Discussion

In Florida, to state a claim for tortious interference with a business relationship, Atrium must allege 1) the existence of a business relationship, 2) knowledge of the relationship on the part of Counter-Defendants, 3) an intentional and unjustified interference with the relationship by Counter-Defendants, and 4) damage to Atrium as a result of the breach of the relationship. *W.D. Sales & Brokerage LLC v. Barnhill's Buffet of Tennessee, Inc.*, 362 F. App'x 142, 143 (11th Cir. 2010) (citing *Ethan Allen Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)). The only disputed element between the parties is whether Counter-Defendants intentionally and unjustifiably interfered with the relationships between Atrium and Foxwoods and Atrium and Caesars.

For an interference to be unjustified, "the interfering defendant must be a third party, a stranger to the business relationship. . . . [A] defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Palm*

4

*Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009) (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001)) (internal quotations and citations omitted).

Here, Counter-Defendants argue that they cannot be considered "strangers" to either of Counter-Plaintiff's prospective business relationships because they were parties to the alleged transactions. (DE 30 at 4). Specifically, Counter-Defendants argue that because Atrium admits entering into a contractual relationship with them "to sell certificates", they had "both a supervisory interest in the relationship as well as a significant financial interest in any relationship between . . . Atrium and any individual or entity to whom . . . Atrium sold travel certificates." (DE 36 at 4–6). In response, Atrium concedes that it had a contractual relationship with Counter-Defendants through their customer services agreement. Relying heavily on *American National Title & Escrow of Florida, Inc. v. The Guarantee Title & Trust Company*, 810 So. 2d 996 (Fla. Dist. Ct. App. 2002), however, Atrium suggests that this relationship is "distinctly separate and unrelated to" the business relationships between Atrium and its prospective customers, i.e., Foxwoods and Caesars, and thus Counter-Defendants can be held liable.

To support this assertion, Atrium points out that "the Customer Services Agreement is silent as to any customers, or potential customers, that ATRIUM may seek out in order to effectuate the sale of travel certificates." (DE 40 at 4). Additionally, the agreement requires that Atrium "shall at all times be solely responsible to make its own separate business judgments, decisions and implementations based on its own independent evaluations and determinations." *Id.*

As to the cultivation of Atrium's prospective relationships with Foxwoods and Caesars, Atrium asserts that it used its own resources, business contacts, and skill to secure customers for the sale of travel certificates. All of these factors, according to Atrium, warrant a finding that Counter-Defendants' relationship with Atrium was separate, distinct, and unrelated to Atrium's relationships with Foxwoods and Caesars. The Court disagrees.

As noted by one of the cases cited by Atrium in its Response (DE 40), Atrium's reliance on *American National* is misplaced. *See Palm Beach Cnty. Health Care Dist.*, 13 So. 3d at 1095. *American National* involved a title insurance agency that was authorized through an agreement to issue title insurance policies issued by an underwriter. The plaintiff insurance agency alleged that the underwriter improperly interfered with relationships between it and its customers who were buyers or sellers of real estate that retained the agency to close their real estate transactions. *Am. Nat'l Title & Escrow of Fl., Inc.*, 810 So. 2d at 999.   The court concluded that the existence of a relationship between the agency and the underwriter "does not preclude [the agency] from suing [the underwriter] for interfering in [the agency's] relationships with third persons." *Id.*

As the same court pointed out in *Palm Beach County Health Care District*, *American National* turned on whether "the relationships interfered with were unrelated to the relationship between the plaintiff and the defendant." *Palm Beach Cnty. Health Care Dist.*, 13 So. 3d at 1095. The court in *Palm Beach County Health Care District* dealt with a claim involving a statutorily-created health care district charged with maximizing the health of local residents by providing various health-care related services. One of the ways in which the defendant health care district sought to accomplish this end was by having an educational provider arrange with an "emergency medical services" agency "to present a course on a specified date and secure advance approval from the District for the course." *Id.* at 1093. The tortious interference claim arose when the district refused to pay the plaintiff, an educational provider that had contracted with a pair of agencies to provide training. In rejecting the interference claim—and distinguishing *American National*—the court found a direct connection between the defendant district and the relationships at issue because the district "was the ultimate source of funds" for the services that the plaintiff educational provider sought to present to third-parties. *Id.* at 1095. The relationship between Atrium and Counter-Defendants is legally equivalent.

The dispositive factor here, as it was in *Palm Beach County Health Care District*, is that

6

Counter-Defendants are in all meaningful respects the "ultimate source of funds" for any prospective transaction between Atrium and a third-party. Counter-Defendants, as alleged by Atrium, were to redeem or fulfill the certificates submitted by Atrium's customers. (DE 30, ¶¶ 10, 18); (DE 1-7, ¶ I). Regardless of the fact that Atrium independently cultivated the business relationships with third-parties, ultimately those "relationships" could only be consummated "when approved by" Counter-Defendants and Atrium. Thus, Counter-Defendants cannot be viewed as a stranger to the relevant transactions since they had both a supervisory interest and a potential financial interest in any relationships between Atrium and any entity or individual to whom it sold travel certificates. Unlike *American National*, where a disinterested third-party interfered with relationships in which it would otherwise never be involved, here the agreement between the parties contemplated and required approval from Counter-Defendants. Whether the approval came in the form of direct payments for services—or in the form of the redemption or fulfillment of certificates—does not change the fact that Counter-Defendants were effectively "the ultimate source of funds" necessary to close a deal.

Further, the great weight of authority in Florida supports the proposition that parties with legitimate, legally recognizable stakes in a business relationship are not liable for tortiously interfering with that relationship. Courts have rejected such interference claims, for example, where agreements between a plaintiff and third party were conditioned on the defendant's approval. *See Ernie Haire Ford, Inc.*, 260 F.3d at 1294 (transfer and relocation agreement); *Genet Co. v. Anheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. Dist. Ct. App. 1986) (sales agreement). The Eleventh Circuit Court of Appeals has recently held that a pair of wholesale food brokers had no interference claim against a restaurant chain that decided to bypass the brokers and buy its food products directly from the brokers' suppliers. *See W.D. Sales & Brokerage LLC*, 362 F. App'x at 142–44. In *W.D. Sales*, the brokers argued that although the defendant restaurant chain was a party to one particular relationship between the brokers and the suppliers, it was not a party to the brokers' "separate" business relationship with the suppliers concerning the payment of commissions to the brokers for

the sales of food products to the chain. In rejecting the brokers' argument, the Eleventh Circuit reasoned that "because the commissions paid by the Suppliers to the Brokers for its representation in food sales to [the restaurant chain] would not have existed absent [the chain's] agreement to purchase and pay for the Suppliers's food products, it simply is not plausible to separate the relationship involving the food sales from the relationship involving the payment of commissions for the food sales." *Id.* at 144. Again, there is no significant distinction between the relationships that existed in *W.D. Sales* and the relationships that existed here.

Atrium suggests that "separate" business relationships exist between it and its prospective business partners—Foxwoods and Caesars. But because those relationships could never fully or meaningfully exist absent Counter-Defendants' approval, "it simply is not plausible" to separate the Atrium-Foxwoods and Atrium-Caesars relationships from the relationship between Atrium and Counter-Defendants.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs/Counter-Defendants Motion to Dismiss Defendants/Counter-Plaintiffs, Ken Sternfeld and Atrium Enterprises, LTD.'S., Amended Counterclaim (DE 36) is **GRANTED without prejudice.** Counter-Plaintiffs have leave to amend.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 12th day of October 2012.

_____
KENNETH A. MARRA
United States District Judge